Tom Gordon, Your Honor, for the appellant. You may proceed. Thank you. I will reserve five minutes. I'll try to keep my eye on the clock. Since my time is short, I will get right to what I think is the meat of the case. Your time is actually long for hearing these cases. Pardon me? I said your time is actually long for hearing these cases. I appreciate that. In fact, I noticed how many had asterisks on them. There are two documents that are important to this case. There are a handful of Oregon cases that are important to this case, and there's an Oregon statute. So without any other preliminaries, let me get right to it. The first document is the letter from the EPA, and it was dated January 18th of 2008. And it was sent to the Anderson Brothers Company. It is denominated in the Wray line as the first request for information. That's going to be significant when I talk about the Oregon cases, and it's going to be significant when I talk about the Oregon statute. It also says on the first page of that letter that the EPA is seeking information from various categories of folks, and one of the purposes for that is to identify additional potentially responsible parties. The letter then goes on to say it cites or sends the recipient actually to its website, if they care to go there, for the purpose of asking them to take a look and make sure that if you find documents on there that we already have, don't set us duplicates, but we already have some information. We're seeking additional information. It also has a warning about violating 18 U.S.C. 1001. It does. Which is more than just, hey, tell us some information. It does. This is pretty serious. And there are consequences if the recipient says, ha, this is just a request for information. Let them go get their own information and tosses it. There are substantive consequences as well, right? That's correct. And it would be the same consequences as if you had ignored a subpoena or if you had ordered or ignored any other of the vast variety of police power investigatory tools that are available to the State and Federal Government. Essentially, what I understand the other side of the claim, and I think that this Court accepted, is that this is the way the EPA commences litigation. Some litigation starts with a complaint. Some litigation starts with a petition. This one, EPA, when it wants to get you on the hook, sends you one of these letters. It's that you know that you are on the way, you're stepping on a or you're being forced onto a treadmill that's going to take you to some very expensive places. The treadmill doesn't – isn't the litigation. The treadmill is investigatory at this point, and it may lead to litigation, as I'll point out here shortly. In connection with this letter, there's also in the record – Does anyone ever get a letter like this that winds up not having to clean up? Yes. Yes. We just litigated a case in Federal court with Mr. Rao. Where, so far, the only thing that's ever happened is the Ashgrove case, which is mentioned in here. Where, so far, the only thing that's ever happened is they got a 104-E request and that's it. Because the 104-E request is much broader. So far, it's a – it's been several years. It's been four or five years. So what the EPA does is it uses this for various purposes, and it can be simply a conduit. It's also true, as I understand it, that the – I guess it's not attached in here, but there are – the questions are rather voluminous and complicated, and no one would be advised to fill it out without a lawyer. That's probably accurate, yes. The same with the subpoena. The same with any other investigative effort that the Federal government brings to bear, or the State government. What is a general matter? Back up, and this may be a foolish question. Leaving aside the environmental area, if someone gets a demand letter from – signed by a lawyer that says, you know, we believe that you did X, Y, and Z – and I understand it's not this, but it's the next letter, okay? We think you did X, Y, and Z, and we think you're liable to us for a gazillion dollars. Does that lead – is that a suit within the statute? Within the policy? No. It may well be a claim under the policy. And there's a distinction between a suit and a claim under the policy. And the insurance company has an obligation only to defend suits, not claims. They can if they want, but they don't have to. And that's set out – that dichotomy is set out in the language of the policy. Well, it seems to me actually in the policy that claim meant something else. It meant a subdivision of suit because it said something to the effect of you can settle a suit or a claim, and a claim is within the suit. In other words, you can file – you can settle some of the suit or all the suit. So I'm not sure that in the policy that that's – has to be read that way or even is more likely read that way. Actually, I think under – under Hoffman, which is the process we go through here in the Oregon law, I think it would have to be read that way. Otherwise, there is no need for the word claim if it's just some subpart of suit. You can either settle the whole suit or you can settle a claim in the suit. But you don't have an obligation to defend a claim, so it has to be something different than a suit. And that's the way Hoffman would look at it. Otherwise, you can't make sense out of those two words, which are literally in the same paragraph. I think I just made sense out of it, but go ahead. Okay. The other significant part of this 104E is what's in the record in it. It was an environmental fact sheet that came out simultaneously with the 104E letter from the EPA. And the important part of it is that it says that these letters are requesting information that will help EPA learn more about the materials handled at these sites, past practices, and known or suspected releases of contamination. It then goes on to say, The information requests letters do not designate an entity as a potentially responsible party. So this is an information-gathering exercise, and to the extent that it provides information about other unrelated third parties, it would be used as such by the EPA, and they won't necessarily ever have to come back and talk to you again, as I said in Chapter 4. The coercive provisions apply to anybody? Can EPA send me a letter with all these 80 questions and ask me to answer them and threaten me with fines if I don't? The answer is that you would have to fit within the category that the EPA has set out, which would be past owners, current owners, operators, and so forth and so on. Right. Somebody connected with a property where there was a suspected toxic waste dump, right? No, not necessarily an expected toxic waste dump, but somebody in that suspected. Not even suspected necessarily, because oftentimes they're trying to prove the negative as well as prove the positive, which is to say narrow the field to those who are actually polluters and eliminate those who weren't. And that happens. But it has to be somebody associated with it. Yes. Some piece of property where there's a suspected dump. Sure. In this case, right, yeah. In this case, there's a Superfund site, so it has boundaries around it. And so they sent letters to the folks that had some connection with pieces of property within the boundary. That doesn't mean they're polluters. It just means that they're in the neighborhood and they have information. But the point here, of course, is that liability doesn't – ultimate liability doesn't depend on anybody being a polluter. They have to have some nexus to the pollution. They have to be an owner-operator. No, there's a nexus to the property that has a nexus to the pollution. Correct. So it's – But if you look at the way it's done in practice, and in fact if you looked at the statute and if you look at the case law, there does have to be a nexus to the property damage and from that polluter. In other words, the EPA can take this information, as I said, and simply use it as a conduit to run through to find those who are actually the active polluters. So let me make sure I understand what you're saying. So first thing the EPA would do is define the boundaries of a Superfund site. Is that right? Yes. Okay. So if you are outside those boundaries or if you own property in a different location, they couldn't send you one of these letters. It has – you have to have some connection to property within those boundaries. That's the way the Superfund site is set up, yes. So if you get one of these letters, it suggests that there is a potential for liability because you are within the – you own property within the boundary, it's not – it's    letters because you own property within the boundary. So in some regards – actually, let me back up a little bit. They could send letters to those that are, in fact, outside the boundary to the extent that there were potential contaminant pathways that got inside the boundary, for instance, sewers, stormwater runoff and so forth and so on. But again, it has to have some nexus to what they are doing in terms of the cleanup. But what isn't true is what you said a minute ago, which is that they are looking for active polluters. They are not looking for active polluters. They are looking for some – a potentially responsible party who could be – could own the property from which there was pollution 20 years ago or could have owned the pollution – could have owned the property 20 years ago and never – not been there in 20 years, right? There's the practical side of this, and then I guess there's the sort of Armageddon side of this. And if you look at the cases both from Oregon and around the country, that's not what they do. They use the information to go find those active polluters, and then they collect the money from them to the extent that they still have assets. So that's a bit of a problem. If you look at the statute, the Oregon statute that was in play here, it sets out that there is no pollution on the property now, even if there's no pollution on the property now, if there was. Pardon me? If there was. If there was no pollution on the property? No. If there isn't now, but was. I'm aware of no instance where the EPA has done that. I thought that's why we have lawsuits where people get upset about this. So if you look at the statute, the Oregon statute that was in play here, it sets out a fairly straightforward process which is consistent with the case law. And as it relates to the 104e, it requires three things, actually. Can I back up one more time? Sure. Are you contesting the other letter actively, really, seriously, the second letter? Yes. For this reason. It uses the word May. It doesn't say we have designated you as a PR company. The reason I ask the question is because you're spending most of your time on this. I guess the Court spent most of your time on this. I know. And I just wonder if it isn't a foregone conclusion that the other letter is a suit under the existing Oregon law and under the statute, and that's the end of that. No, it isn't. If you take a look at the site history, or site history that was put in the claim letter from the policyholder to the insurance company, you will see that most of those pieces of property were vacant during this period of time. Those that weren't were used for offices, some for storage of vehicles. This is entirely possible, one of those situations, where all they want to know is what did you do, and is it conceivable that it contributed some sort of a contamination, which is of interest to us in the greater harbor. And so what they found was that there may have been some, quote, unquote, releases, but they didn't name them as a PRP because they weren't sure those are the folks that did it. The second letter clearly covered by the Oregon statute, I mean, by the language. It's a lot closer to Oregon. It's a lot closer than the rest of the first letter, but the second letter is pretty much right on point. That is correct. It is closer along this continuum. But if you look at Schnitzer, it's got to go further. No, no. Maybe I'm spoke. What I meant to say is it's sort of closest to the first one. I didn't think it was at all closest to the second one. I thought it was clearly covered. Well, the statute, yeah, the statute requires under ORS 465, 480, sub 2, it requires three things. One is it requires an independent demand. The first letter is not a demand. It's the first. We're talking about the second letter now. Okay. That may be a demand to undertake further investigation. Okay. So it may have satisfied the first part. It has to be pursuant to a written or voluntary agreement or order, or it has to be a demand. Secondly, it has to involve an environmental claim, which is defined in the statute. Where is it defined in the statute? It is defined under the very first subsection, 465, 475. An environmental claim means a claim for defense or indemnity by an insured facing or allegedly facing potential liability for bodily injury or property damage arising from a release of pollutants. So there has to be some nexus to property damage and pollutants and a claim against this insured for that damage. I'm sorry. This is a requirement in the statute? Yes. Where is it in the statute? It is in 465.475, sub 1, parent 1. That's a definition of an environmental claim. It is. But where in 455, 480 is a requirement of an environmental claim? Ah, because if you look at the definition of suit in the construction of the statute, in order to have the statute apply, you have to have, like I said, a demand. And it has to involve an environmental claim. Give me a section, a subsection. Oh, I'm sorry. It's 480, sub 2. It requires a demand and it involves and it requires an environmental claim. So you have to have that first before you even get to the discussion of the request. And so when you look at the 104e, it was the first contact and it was clearly a request. Do you have the statute there? I do. Where is the where in 2 is a requirement? I believe it's there. It's the last two words of the first subparagraph under parent 2. Okay. It says, Okay. So you have to have a demand, you have to have an environmental claim, and then you go on to the analysis of the request. You've got to have all three things. And it obviously has to involve some property damage, which is why I say there has to be a nexus between the property damage and what the EPA is attempting to collect here. Yes. And go ahead. So what's the problem? Pardon me? So what is the problem? Why is it? Well, with particular respect to the 104e letter. Okay. We're talking about the second one right now. All right. All right. That's right. Because they haven't in this made a demand for them to do anything in connection with, quote, unquote, property damage. What they've asked them to do is investigate further. Well, that's involving property damage, right? Not necessarily from this insured, which would be required in my interpretation of the statute. In that letter there's a sentence that says we have reason to believe that there was contamination coming from this property, right? Or has in the past. Right. Or has in the past. Right. Right. And? And my point is what they may be looking for is simply the information to go find the people who polluted it, because that's the way it works. They go find those folks and make them clean it up. As I said. I'm going to ask your opponent, but I just think you're flat wrong about that. I thought that the people who now own the property have an obligation. And as a practical matter, that's not the way the agencies work, though. They use these as conduits to get the information to do that. And these properties were largely vacant, as I said. So like I said, the 104E letter is pretty clear. The general notice letter is along that continuum. My point is I don't think it's all the way to a quote, unquote, suit. It might be a claim, but it's not saying you are responsible, go clean this up. It might get there, but I don't think it's there yet. I know. I'll save the rest of my time, then. Okay. Thank you. May it please the Court, Seth Rau for Anderson Brothers. Could you begin by just asking my question about CERCLA? Is the current owner of a property from which there was pollution a potentially responsible party? Yes. It's 942 U.S.C. 9607, the very first subpart, I think it's 1, says owner or operator of a facility. That is correct. It doesn't have to be a facility that right now is necessarily leaking anything, but was. That's right. That's right. So Anderson Brothers owns and historically had owned and leased properties within the bounds of the site, as defined by the EPA. The boundaries of the site were defined in 2000. So in 2008, when Anderson Brothers received the 104e request, the upshot of that 104e request was we have you in our sites. You are a landowner within the site. Strict liability. There's contamination. It directed the, in short, Anderson Brothers to the website, which contained voluminous documentation that had already been collected about the contaminants, the contamination pathways, the basis for the setting of the boundaries. So Anderson Brothers was within the realm of people who were already potentially responsible parties. There's nothing in the statute that requires that the EPA send you a GNL or PRP letter in order for you to be a PRP. You are a PRP if you fall within the definitions of a PRP under the statute. But you can't be within the Superfund site and not a PRP. You can only be within the Superfund site and not be a PRP. If I understand. Right? That's right. And you could be the recipient of this letter and not be a PRP. That's the first letter, the 104e letter. I think that it is possible that the EPA could send 104e letters to folks who do not fall within the definition or do not facially, obviously, fall within the definition of a PRP within the statute. I think that's possible. But that was not Anderson Brothers' situation. And I don't know that the EPA does it, has done it or has done it specifically at this site. In other words, send a 104e letter to somebody who just isn't an owner-operator, isn't an arranger, isn't a disposer, all the other categories of PRPs. Well, but I mean, just conceptually, it seems that you have a boundary of a – first of all, who is eligible, who is responsible to answer these letters? What's the – I mean, I asked the question before, can you just send it to anybody? You said you can't send it to anybody. They have to be within the Superfund site. But is that all you have to be, just within the Superfund geography site? It's within the EPA's discretion, I believe, yes, to send it to – to anybody. And the – Well, not to anybody or anybody within the boundaries of the Superfund. Within the boundaries of the site. And – but there could be properties within that site on which there was never any pollution. That's possible. That's right. And what the – They're trying to figure that out. That's right. And as Judge Kaczynski said, I think, you know, the forced-onto-a-treadmill is the right analogy here. The EPA is saying, we have you in our sites, you're a landowner, you're within the site, you're – you're presumptively going to be liable here. But they don't – but they don't say that. They don't say that at all. They don't say we need some – some information from you. That's right. Because you're in this area. They're compelling – I'm sorry, Judge. Go ahead. Well, I mean, there's – there is a nexus. You're – and we've now established where the letter doesn't say it, which is you're in a certain geographical area. But that's about it. That's right. And they're – they're compelling you into a process in which they're – they're giving you the opportunity to put your best foot forward and make your case that you should not be allocated a large portion of the liability by creating an administrative factual record from which the EPA, functioning as the police, the grand jury, the prosecutor, the jury and the judge, everything but the executioner, the EPA will then determine whether you are eligible for certain defenses, bona fide prospective purchaser defense. The de minimis settlement opportunity will be determined based on the responses to the 104E demand. So they are bringing you into the process, compelling you to give them the information on which your fate will be decided, not by a judge, but by the EPA. So that – so the letter doesn't say we have found that you are a PRP. It doesn't need to. Which letter? The first one? The first one. It would be helpful if you said which one you're talking about. I'm sorry. That's right. What we call the 104 demand, the first letter. Yes, I think you're better off saying first and second. Okay. Anything else you might say. Let's get that part straight. Okay. So tell me what Oregon – first of all, what Oregon case you're relying on for the proposition that that's a suit with regard to the policy and or if you can't do that, what about the statute? Well, Judge, I think that even if we were – even if I was standing before you today before 1999, before the statute was passed, the 104E would be a suit. And that's what – then the district court, Judge Mossman, found that even without what we call the OECA, the statute, this would have been a suit. And there had been the McCormick and Baxter decision, which was a DEQ administrative action in which the court found – But in which there was an actual demand to clean something up, wasn't there? That's right. It was a factually different circumstance. Well, yes, in a rather significant way. I mean, certainly that establishes that you don't have to have a lawsuit, and it seems to establish – Oregon law seems to establish maybe you don't even have to have an actual proceeding as such, but you're trying to back it up quite a ways from where the Oregon – existing Oregon law is, aren't you? Well, I don't think McCormick and Baxter set an outer boundary on what could be a suit. But even – even – I didn't say that, but I just – but what are you relying on? I mean, in other words, I understand that you have McCormick and Baxter, but you're trying to back it up. So backing it up to a situation in which no one has said that you in fact have any responsibility to clean anything up, where are you – where does that come from? Well, then we have the statute, which – So you're essentially conceding that you can't do that under Oregon law without getting to the statute? I'm just trying to be clear about where we are here. I don't know that I would concede that, but I don't think that it's necessary, because we have the statute. The Oregon legislature has made a determination that it's in the interest of the State for the term suit, absent some contrary intent expressed in the policy, to be construed in a certain way. And that's the language of 465-482-b. And we've gone through the analysis. But what about the constitutional argument? This contract was entered into in 1979 or something? That's right. The policies were dealing with that. And then 20 years later, the legislature comes along and adds new burdens to an existing contract. So what if it is? I don't think there's any impairment, Your Honor. And the reason, to put it most simply, the reason is that we have the Savings Clause, that unless – that if there is a contrary intent in the policy, that is an intent that the term suit be interpreted differently than is set out in the statute, the OECA, that the statute applies. So if there was – if there was going to be any impairment, we would not be applying  But what's weird about this is that if you think that's what it means, then you have to think that you could prevail without the statute, because Oregon law always was, you know, what's the intent of the parties. And so either the statute means nothing because it has backed out everything that wouldn't have been covered by Oregon law before the statute because of the – with the Savings Clause, or it means something, i.e., it has changed something. So has it changed something or nothing? I think it has changed something, Judge. And I'll concede that there is a tension here between the way the statute operates with its Savings Clause and the way Oregon law normally works under the Hoffman analysis, under which you attempt to discern the intent of the parties, you don't resort to extrinsic evidence. If there are two competing alternative definitions that are reasonable, you construe it against the drafter. In other words, you construe it in favor of coverage. I think what the statute does is it changes that a little bit by saying once you get to the point that you have looked at the language of the statute and you don't see any intent in there that is different than the statute, so that's the first way that it's different, is it kind of – it's giving you a guidepost for what kind of intent you're looking for. Then it says you construe it against the drafter in this particular way, and it actually gave some outer limits to what could be a suit. For example, if you're trying to proceed under this statute and all you got was a phone call, that is not going to be a suit. So in other words, construed against the drafter could hypothetically, in the absence of the statute, mean a phone call would be a suit. But this statute says, I think that – I think this changes Oregon law by saying construe it against the drafter in this particular situation. The outer limit is it has to be in writing. That's one example. So in your view, what it's doing is it's creating an interpretive presumption, essentially, which the statute has to – which the policy can rebut by being specifically otherwise. I believe that's accurate, Judge, yes. What about his argument that the first letter isn't a suit under the statute because it's not about – it's not a claim because it's not about a property loss, it's only about information? The question under Oregon law about the duty to defend, which is where we are, is whether there is a possibility of covered – of liability being imposed for covered, in this case, property damage. This letter is starting the insured on the treadmill that Judge Kaczynski referenced. And the end point of that is going to be, if you're a landowner within the site, is going to be liability for property damage. So the fact that the way the EPA, in this nearly unbridled discretion and this rather onerous administrative scheme, proceeds in this case is by starting out by asking you for information. It doesn't change the fact that we're on a trajectory that you can see through the agency statutes and its implementing regulations. In other situations, the EPA start – and with other entities at this site, the EPA doesn't start with the 104e letter. It starts with the PRP letter, the second letter that Anderson Brothers received. I think it makes a difference in this case whether we include the second letter or also include the first letter. There were expenses in response to the first letter that happened before the second letter. That's right, Judge. In this situation, the first letter caused Anderson Brothers to retain a lawyer and an environmental consultant in order to prepare its response, because Anderson Brothers understood that it was creating the administrative record, so it needed to be accurate. It needed to investigate if there were contaminants, where else might those contaminants have come from. Did they come from their neighbors, for example? The consequences of saying, I don't know, let's just throw it away, we're not going to deal with it right now, let's wait, if they're really serious, let's send us – let's send us one of those other letters, the general notice letters, but we're not going to deal with it. What would have been the consequences of not responding? Well, there – for Anderson Brothers, the damages that we suffered were to respond to the 104e. Anderson did not have the financial means to respond to the second letter by doing what the EPA said to do, which is join this – the convening group. So those are the damages in this case, is the 104e, damages associated with responding to the first letter, the gathering the information and making the – Well, I'm saying, what if they had not responded? What would have been the consequences? The consequences are severe. The statute says that the EPA may refuse to enter into a settlement with you if you do not respond to the 104e letter in the de minimis settlement section of the statute. And in the Canons Engineering case – But doesn't the letter set forth the consequences? Judge, the letter sets forth some of the consequences, which are the immediate consequences of failing to respond in terms of civil penalties, potential criminal $32,500 a day. Exactly, right, $32,500 a day. Those are – those are immediate civil penalties. But there are other longer range, and I would suggest potentially more serious penalties if you do not respond. One of them is Does EPA start all this with some kind of an administrative announcement or public proceeding? In other words, when it decides there's a Superfund site, is that subject to any Federal Register announcement or involvement or – go ahead. Yes, I believe, yes, there were certainly announcements in the press, certainly covered that it had been designated as a Superfund site. And I believe that EPA is also required to announce – I'm not sure if it's in the Federal Register, through some sort of administrative mechanism – that it has listed a site on the NPL, on the National Priorities List. And the people with – who own property within that area, do they have any means of contesting that? I don't believe so, Judge.  And that's a letter from an investigation that Anderson Brothers received before any of this from the EPA. And that was a letter from what's called the Lower Willamette Group in 2006, which we have not contended in this case was a suit. It was – the Lower Willamette Group is a group of private parties, the first group of entities that the EPA notified that they were PRPs and told them that they were going to be what's called performing parties, that those parties, large, mostly industrial concerns and also governments, were going to be funding the remedial investigation. So we received this letter back in 2006 notifying Anderson Brothers of that. But again, there was no – there were no consequences particularly that followed Danterson Brothers as it happened from receiving that. It was a threat of a lawsuit from these private entities. Kennedy. Let me ask you a question about the contracts. Under Oregon law, you said the original insurance contract was in the 1970s? The first of the two policies that were the subject of the summary judgment motions on which this judgment is based were in 1979. That's right. Now, is that policy renewed from time to time? Yes. The Anderson Brothers had started purchasing general liability insurance from St. Louis at that time, and there was also a predecessor entity. So there's a 1979 policy and then a 1980 policy that were specifically – essentially we chose those two policies to litigate in this cross-summary judgment. And they just ran indefinitely? No, I don't believe they went indefinitely, Judge. I think Anderson Brothers changed carriers sometime later in the 1980s. But you didn't have to? They're occurrence policies. That's right. These are occurrence-based policies. And then, of course, the point is that if you have a claim at any point that's a viable claim for an occurrence of that year, the policy is enforced. That's right. That's right. I was just trying to find out when you entered into the policy, you said only you entered into it the first time you obtained the policy. There were no intermediate times where you renewed the policy or it just ran forever? No, no, Judge. I apologize if that was what you took from my answer. These are separate policies, and the policy language did change over time, not as to any portion that's relevant here. Anderson Brothers had first – had purchased its first one-year policy quite a bit before, I think, the 1979 policy. And I don't think it's quite accurate to call them a renewal, but it did purchase essentially the same coverage from the same carrier in multiple policy years. Are there any cases of this ilk pending in Oregon at this point with regard to the statute, for example? I mean, we have no guidance from the Oregon courts about the statute, do we? There is limited guidance from the Oregon courts on this statute, and I don't think that there are any – there is any guidance on whether this is a – on the application of this specific provision in this context. There have been, obviously, Federal cases. Judge Mossman here and then Judge King before that and Judge Acosta, I think, slightly afterwards, came to the same conclusion that Judge Mossman did, that the 104e, the first letter triggered the suit.   Kagan. I have a generic question to your opponent about demand letters in general. What is your understanding about the obligation – if I get a letter from somebody saying, you know, I think you're doing – you did X, Y, and Z, and I want $100,000, and if you don't pay me, I'm going to sue you, if I go to my insurance company and say I want you to respond to this, I want you to hire me a lawyer to respond to this, do I get one or not? If it's a suit, if the language of the policy says suit. I think as a general proposition, I would agree with Mr. Gordon that Travelers is likely to deny that that is a suit, and I don't think that I'd have much basis to disagree. There are exceptions to that. But this is different because is the government saying that? Well, the government writes me a letter and says, you know, you ran into my bus and I want $100,000. Does that make a difference? Well, it certainly makes a difference, I think, in this case, because CERCLA is a strict liability statute, and this administrative process is different. And I don't know whether there are other agencies that have a similar process. Why does that matter, whether it's strict liability or not strict liability? Well, because the agency doesn't have to go – in order to proceed to a determination and say, now you pay for your portion, the EPA does not have to go to a court to establish – to establish something. Well, ultimately, because if I say no, you know, I don't think there ever was any contamination on my property. They do have to prove something. They have to prove there was contamination on the property. I don't see why that makes any difference as to whether it's a suit or isn't a suit. Well, the presumption shifts to the – to the – in this case would shift to Anderson Brothers to prove that the EPA's determination was – was incorrect. But as to – going back to whether it was a – it was a suit, I think that it does make a difference here that the way CERCLA operates and the way the Superfund law operates, that's not to say that there aren't other agencies that don't have similar procedures. There may be some and there may be not, which is why you have to look at not just the particular document that's received, but the legal context in which that letter operates. For example, Oregon, like California, in construction defect suits has a noticing cure provision. And so my construction clients get letters from homeowners associations which are pursuant to an Oregon statute. They're a demand letter. But here the second letter didn't say you are a PRP. It said, you know, we have reason to think that. And they would still have to prove that up in an actual – if they really wanted to get money, if this person was just completely resistant and said, I'm not doing anything, they'd have to go to court and they'd have to prove up something, right? I think all they'd have to prove, though, is what is – what nobody could contest, which is that Anderson Brothers is a landowner within the site. Is that accurate? Nothing about whether there was ever any contamination on their property? I don't believe that they would – Just that he's a landowner in an area that otherwise – somewhere in that area there's some contamination, but not that he has contamination? The – what I do know is that the burden – once the EPA has made a determination that you have – that you will pay X amount, the burden shifts to the PRP or the And there's also a limitation that it's based on the administration of the property. But that's a different question from having to establish in the first place that there was ever any contamination coming from that property or on that property. Judge, I think the answer is I don't know exactly what has to happen, because it doesn't happen.  In order to impact your liability, you have to get involved early. The EPA will then – will send a unilateral administrative order requiring payments or cleanup or participation. And challenging those, the judicial review is extremely limited and constrained. Thank you. You have about a minute left. We'll make it three minutes, because the case is difficult. Go ahead. Okay. Two quick points. See if I can circle back to this general notice and about why the May language makes sense. Mr. Rao is right that you – if you get a 106 letter, you fit within the broad category of potentially folks who could get a PRP letter. But this actual letter says, EPA has evaluated the information in connection with the investigation of the site to date and believes that Anderson may be a PRP. What's the next sentence? PRPs under CERCLA include current owners, operators of the site, and so forth. And the EPA has evaluated information in connection and believes that – no, no. Then it says specifically, EPA has reason to believe that the hazardous substance has been or are being released from facilities located at such-and-such. Correct. But then it doesn't go on to do what the cases in Oregon said you need to do to create a suit. And that's where I was headed with this. Just because you fit within this broad category of owners and operators doesn't rise to the level of a suit, because down under the next heading it says, EPA would like to encourage you to communicate with the other. But this is enough information, and specific information, and it's enough information. As I understand it, that if they put this in a complaint in a court, they would have – they would not be subject to a motion to dismiss. Just that sentence. We have reason to believe that hazardous substances have been or are being released from facilities at that – in that place. But under Oregon case law, that's still – they could do that, of course. But under Oregon case law and under the Schnitzer case and under McCormick and Baxter and under the statute, it has to be involving a demand for property damage. And I don't think this letter gets there yet. That's all I'm saying. They could follow up with another letter or they could follow up with a lawsuit that says you have contaminated. But if you look at the – But substances have been or are being released. Right. If you look at the – or are being. Yeah. If you look at the Oregon cases, they are very specific in terms of consent decrees, with cleanup plans and so forth and so on. That's where the Oregon courts have held that the line has crossed from investigation to accusation. And that's all I was attempting to say. And the other question you raised, Your Honor, was about whether the Oregon courts have looked at this at all, the statutory construction, and they did under the Massachusetts bonding case. And they went back through the Oregon cases and adopted the analysis, the rationale of McCormick and Baxter, Schnitzer and so forth. And then in the footnote to that case, they say, We note that the legislature has codified the same construction. So the point is that the legislature wasn't attempting to make a radical change in here. It was codifying the old law, which is to say you have to go from investigation to accusation to have a lawsuit. I guess I'm out of time. Thank you. Mr. Scalia, you will stand submitted.
judges: Kozinski, Reinhardt, Berzon